## RASE v. UNITED STATES.

No. 9164.

Circuit Court of Appeals, Sixth Circuit.

June 29, 1942.

U. S. A. Heggblom, of Detroit, Mich. (U. S. A. Heggblom, P. H. Cale, and G. W. Palon, all of Detroit, Mich., on the brief), for appellant.

Kenneth D. Wilkins, of Detroit, Mich. (John C. Lehr, and Kenneth D. Wilkins, both of Detroit, Mich., on the brief), for appellee.

Before SIMONS, HAMILTON, and MARTIN, Circuit Judges.

SIMONS, Circuit Judge.

The appellant was convicted and sentenced for failure to report for induction under the Selective Training and Service Act of 1940, Title 50 U.S.C.A. Appendix § 301 et seq. Motions for directed verdict at the conclusion of all of the evidence, for new trial, and for judgment notwithstanding the verdict, were denied, and the rulings are assigned as error.

The record discloses that the appellant registered when required so to do, and upon receipt of a questionnaire mailed to him by his local board, claimed to be a conscientious objector opposed to both combatant and non-combatant service in the armed forces; that while he was not a minister of religion he was a minister of the gospel. With the questionnaire the appellant filed affidavits and letters identifying him as a Jehovah Witness. The local board at first classified him as a conscientious objector in classification IV-E. Later he was reclassified in I-A and so notified by card. He then appealed to the board of appeals asking for a IV-D classification as a minister of religion. This classification was denied to him and the I-A classification affirmed. Subsequently, the case was reopened at the appellant's request, by Major Engstrom of the Wayne County Selective Service Headquarters, and the file was sent to the President at Washington for his decision on appeal. The request for the IV-D classification was denied in the decision of the President, but the local board was instructed to reopen the case upon the question of conscientious objection. The appellant was then informed by letter that his case was being reopened, and that if he had evidence for the board to consider he should submit it before a given date. The appellant replied that all information which might prove helpful in arriving at his proper classification had already been submitted to the board, whereupon the board reclassified him as IV-E. From this reclassification no appeal was taken and the board notified the appellant to report for induction into work of national importance under civilian direction on November 7, 1941. On November 6 the appellant responded by letter to this notice, stating he would not report for induction as ordered, because to do so would be in violation of his covenant with his Creator, Jehovah God. Notice of suspected delinquency was mailed to the appellant on the 7th of November, and failing to appear for induction as required, his delinquency was reported to the United States Attorney, and indictment and trial followed.

The principal error complained of is the failure of the court to direct a verdict of not guilty on the ground that the finding

of the local board was not the result of a full, fair, and impartial hearing, and that its classification of the appellant in IV-E, upon denial of his classification as a minister of religion under IV-D, was a nullity; wherefore, no offense was committed by failure to report for induction under § 11 of the Act. Other questions raised in brief and argument and by the statement of errors, are subsidiary or collateral to this main question.

■ The Selective Training and Service Act of 1940, like its predecessor, the Conscription Act of 1917, 50 U.S.C.A. Appendix § 201 et seq., is a completely integrated statutory project for the registration, classification and induction into the armed services of all male citizens of the United States, and all male alien residents who have declared citizenship intentions within prescribed age limits, with certain narrow exceptions and exemptions. All registrants are subject to classification which protects the exemptions and deferments prescribed by the Act or the regulations, and all questions or claims with respect to exemption are committed by the Act to the jurisdiction of the registrant's local board for determination, subject to an appeal to the appeal board, and from the appeal board to the President of the United States. No power to review any classification, or the denial of an exemption, is conferred upon the courts. It follows, therefore, that a decision of the board made upon substantial evidence after a fair opportunity to be heard has been granted the registrant, is final and conclusive except only as it may be set aside by the appeal board or the President. Angelus v. Sullivan, 2 Cir., 246 F. 54.

■ While the rule is established that the action of such local boards, within the scope of their authority, is final and not subject to judicial review when the investigation has been fair and the findings supported by substantial evidence, nevertheless, upon proof that the investigation has not been fair or that the board has abused its discretion by a finding contrary to all the substantial evidence, relief may be accorded by the courts under the writ of habeas corpus, Chin Yow v. United States, 208 U. S. 8, 28 S.Ct. 201, 52 L.Ed. 369; Angelus v. Sullivan, supra; Arbitman v. Woodside, 4 Cir., 258 F. 441; United States v. Kinkead, D.C.N.J., 248 F. 141, although even then it must first appear that the registrant has exhausted his administrative remedies under the Act. Johnson v. United States, 8 Cir., 126 F.2d 242.

■ The question, therefore, before the court below, as we view it, was not whether there should have been submitted to the jury the fact issue as to whether or not the appellant was a minister of religion and so entitled to exemption under the Act, because neither to the court not to the jury has decision on such fact been committed by the law. The appellant admitted that he was ordered to appear for induction and failed to respond, so that the only question of fact involved was whether the local draft board had accorded the appellant a fair and impartial hearing, and whether its decision was based upon the evidence before it or was arbitrary and capricious. Assuming, without deciding (compare United States v. Grieme, 3 Cir., 128 F.2d 811 decided June 9, 1942), that the decision of the draft board may collaterally be attacked in a prosecution for violation of the terms of the Act, we find, therefore, no error in the failure of the court to submit to the jury for decision the question whether the appellant's status was that of minister of religion and no error in denying the requests to charge upon this issue.

■ The appellant contends that the finding of the local draft board that the defendant was not a minister of religion and so not entitled to a IV-D classification, was unsupported by substantial evidence, that the board failed to give him a fair and impartial hearing and abused its discretion in denying him his proper classification. It must be observed, however, that we are dealing with an exemption, and that under familiar rules of statutory construction, the appellant must bring himself clearly within the exempted class. Section 303(a) recites that except as otherwise provided in the Act, every male citizen of the United States between the ages of 21 and 36 at the time fixed for his registration, shall be liable for training and service in the land or naval forces of the United States. Section 305(d) is as follows: "Regular or duly ordained ministers of religion, and students, who are preparing for the ministry in theological or divinity schools recognized as such for more than one year prior to the date of enactment of this Act, shall be exempt from training and service (but not from registration) under this Act." Section 310(a) authorizes the President to prescribe the necessary rules and regulations to carry out the provisions of the Act. In

pursuance of this authority § 360 of Vol. 3 of the Selective Service Regulations, reads as follows:

"Class IV-D: Minister of religion or divinity student.

"A. In Class IV-D shall be placed any registrant who is a regular or duly ordained minister of religion or who is a student preparing for the ministry in a theological or divinity school recognized as such for more than 1 year prior to the date of enactment of the Selective Training and Service Act (September 16, 1940).

"B. A 'regular minister of religion' is a man who customarily preaches and teaches the principles of religion of a recognized church, religious sect, or religious organization of which he is a member, without having been formally ordained as a minister of religion; and who is recognized by such church, sect, or organization as a minister.

"C. A 'duly ordained minister of religion' is a man who has been ordained in accordance with the ceremonial ritual or discipline of a recognized church, religious sect, or religious organization, to teach and preach its doctrines and to administer its rites and ceremonies in public worship; and who customarily performs those duties."

In the application of these regulations, and for the purpose of arriving at a workable basis by which the local boards might determine in each case the classification to be accorded to registrants of this particular sect and the exemptions to be granted them, the National Director of the Selective Service System at Washington, D. C., addressed an inquiry, on June 10, 1941, to the general counsel for Jehovah's Witnesses at Brooklyn, N. Y., requesting the names and addresses of those Jehovah's Witnesses who devote their entire time, or substantially full time to the work. This information Mr. Covington immediately furnished to the Director, and based upon it the National Headquarters of the Selective Service System furnished to each State Headquarters, information which became available to the local boards, and such boards were instructed by the Director as to the manner of classifying those of Jehovah's Witnesses who devote their time and efforts in varying degrees to the dissemination of their tenets and beliefs. The instruction was as follows: "The members of Jehovah's Witnesses who occupy the capacities that are known by the various names of regional servants, zone servants, company servants,

sound servants, advertising servants, back-call servants, and by other similar descriptive titles, devote their time and efforts in varying degrees to the dissemination of the tenets and beliefs of Jehovah's Witnesses. The deference paid to these individuals by other members of Jehovah's Witnesses also varies in a great degree. It is impossible to make a general determination with respect to these persons as to their relationship to Jehovah's Witnesses. Whether or not they stand in the same relationship as regular or duly ordained ministers in other religions must be determined in each individual case by the local board, based upon whether or not they devote their lives in the furtherance of the beliefs of Jehovah's Witnesses, whether or not they perform functions which are normally performed by regular or duly ordained ministers of other religions, and finally, whether or not they are regarded by other Jehovah's Witnesses in the same manner in which regular or duly ordained ministers of other religions are ordinarily regarded."

With these regulations and instructions in mind it becomes necessary to determine whether the board accorded the appellant a fair hearing, and whether its decision was founded upon evidence or was arbitrary and capricious. The appellant attached to his questionnaire a statement that he was one of Jehovah's Witnesses, actively engaged in the preaching of the gospel; that he had an identification card from the Watchtower Bible and Tract Society which is given to every person who actively engages in this preaching; that attached to his letter was a card purporting to say that he is a minister of the gospel, signed with Judge Rutherford's printed signature. In a letter subsequently written to the board he further explained that from a very early age he was instructed in the Bible and attended meetings where other Bible students assembled for the purpose of study, and that he took an active part in preaching the gospel to all who would hear; that this preaching was done by word of mouth, by printed magazines, books, and booklets, and by recorded Bible lectures. Subsequently he presented to the board an affidavit giving the names of persons who could, if called upon, give proof as to the sincerity of his professed convictions, and still later in his endeavor to satisfy the board as to his status as a minister, he brought to the clerk of the board three affidavits which certified that he was an active minister of religion

preaching Jehovah's Kingdom message from door to door and conducting Bible studies in private homes for the preceding three years; that the records of the Watchtower Bible and Tract Society would so indicate; and that he symbolized his consecration and received his ordination as a minister of religion in Detroit in February, 1938.

It is the appellant's contention that these proofs showed conclusively that the appellant was a minister of religion within the connotation of that phrase in the Selective Service Act, and since there was no traverse of these affidavits and allegations the local draft board was compelled to accord him a IV-D classification, and any other classification was arbitrary and capricious and unsupported by evidence. The local draft board, however, had before it the appellant's questionnaire which disclosed, over the signature of the registrant, that from 1937 to 1938 he had been employed as a gas station attendant working for two different employers, and that from 1938 to 1940 he had been employed as a stockkeeper for Burr-Patterson in Detroit. There was also recorded a conversation between the defendant and the chief clerk of the draft board, in which the registrant recited his continued employment by Burr-Patterson, jewelers, at a weekly compensation, and that he received no remuneration as a Jehovah's Witness. He recited therein that he was actively engaged in religious work on Tuesday, Wednesday and Friday nights, as well as on Sunday of each week. The board also made inquiry of the State Headquarters as to whether the registrant's name appeared upon the official list of Jehovah's Witnesses transmitted from the National Headquarters of the Selective Service System, and was advised that it did not.

From this evidence the board could fairly and reasonably have found that the appellant, even though devoting a portion of his time to teaching the principles of religion, was not a regular minister of religion or a man who customarily preaches and teaches principles of religion, and the jury might reasonably have found that its decision was not arbitrary and capricious. The information supplied by the general counsel of the sect and recorded in the State Headquarters at Lansing was important. It bore upon the extent of the deference paid to the appellant by other members of his sect. The failure to include his name among those who devoted their time and energy to the dissemination of its beliefs would seem to indicate that he was not a minister of religion as that designation is defined in the regulations.

■■ The phrase "minister of religion" as used in the Act is to be interpreted according to the intention of the Congress, and not by the meaning attached to it by the members of any particular group. Congress undoubtedly intended to exempt such persons as stand in the same relationship to the religious organizations of which they are members, as do regularly ordained ministers of older and better known religious denominations. This is borne out by the provision for the exempting of theological or divinity students. If we understand the appellant's argument, every member of his sect is a minister of religion and so entitled to exemption. No differentiation is to be recognized between shepherd and flock or between pastor and congregants. Followed to its logical conclusion, this would mean that all of the members of any religious group which imposes upon its adherents an obligation to teach and preach its beliefs or to make converts, are exempted under the Selective Service Act without regard to whether such activity constitutes their sole or principal vocation. It is inconceivable that it was the intention of the Congress to incorporate in the Act an exemption so broad and all-embracing. The statutory exemption must be applied in consonance with the clearly apparent purpose of the Congress, and not in response to the interpretation placed upon it by particular religious groups or their adherents. As was said of an analogous situation in the concurring opinion of Mr. Justice Cardozo in Hamilton v. Regents, 293 U.S. 245, at page 268, 55 S.Ct. 197, at page 206, 79 L.Ed. 343: "The right of private judgment has never yet been so exalted above the powers and the compulsion of the agencies of government." Or as was observed recently in Jones v. City of Opelika, 62 S.Ct. 1231, 1238, 86 L.Ed. ——, decided June 8, 1942, "The proponents of ideas cannot determine entirely for themselves the time and place and manner for the diffusion of knowledge or for their evangelism."

■■ Nor do we perceive any failure of the local board in other respects, to give the appellant a fair hearing. The contention that it was obligated to make a complete investigation of the status of the appellant by the calling of witnesses and the search for evidence beyond what was pre-

sented to the board by the appellant himself, must be rejected. The questionnaire was the device utilized by the Act for bringing all available data bearing upon classification to the attention of the board. This was permitted to be supplemented by any other papers, affidavits or proofs that the registrant cared to submit. It is not contended that what he did submit was refused consideration. After all, it was the conscription of the entire manpower of the nation in a time of national crisis, that was involved. The original list of registrants included more than 16 million. It is inconceivable that the law imposed upon local boards a duty to consider proofs of status for classification not furnished by the registrant himself. The obligation of the board to grant the registrant a fair hearing does not mean a trial as by a court or a trial in any strict or formal sense. As was said in Escoe v. Zerbst, 295 U.S. 490, 55 S.Ct. 818, 820, 79 L.Ed. 1566, "[The] inquiry [should be] so fitted in its range to the needs of the occasion."

█ But considering, for the sake of argument, that there was some infirmity in the hearing granted to the appellant by the local board, it appears that when the President's decision was made directing a reconsideration of the classification in respect to IV-E, the appellant was advised by the board that his case had been reopened for consideration of his status as a conscientious objector, and invited to submit any further evidence bearing upon a new determination of his classification. The effect of this was to advise the appellant that his I-A classification had been set aside and that a new classification was to be made. The appellant's response was that the record already contained sufficient evidence to show that he was regularly engaged in the activities of a minister of the gospel. Had the appellant been possessed of, and had he desired to submit further evidence, the way was open to him. It is idle to contend that he could not have been expected to reverse the decision of the President. The question before the board was whether he should be given a IV-E classification. Manifestly, any evidence he might care to produce that he was entitled to a more liberal exemption bore directly upon decision. His response indicates that he so understood it.

█ The contention that there was violation of First Amendment to the Constitution of the United States when the draft board classified the appellant as a conscientious objector and then limited him to the exercise of his religion only in a conscientious objectors' camp, is wholly without merit. If valid, it would lead to the absurd result of a constitutional grant of immunity to all of Jehovah's Witnesses from the penalties of the criminal law, on the ground that they could not practice their religion while incarcerated for violation of the criminal code. The Constitution grants no immunity from military service because of religious convictions or activities. Immunity arises solely through Congressional grace in pursuance of a traditional American policy of deference to conscientious objection and Holy calling. In Jacobson v. Massachusetts, 197 U.S. 1129, 25 S.Ct. 358, 362, 49 L. Ed. 643, 3 Ann.Cas. 765, the Supreme Court, speaking of the liberties guaranteed to the individual by the Fourteenth Amendment, said: " * * * and yet he may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country, and risk the chance of being shot down in its defense." See, also, Hamilton v. Regents, supra. The limit placed upon the power of the states by the Fourteenth Amendment is not narrower than that placed upon the national government by the First Amendment.

No question of religious liberty, in any true sense, is here involved, and the zealous and ill-advised pursuit of a martyr role is not, by the sanction of the Constitution, permitted to imperil national safety without the preservation of which, liberty of conscience and religion will everywhere disappear.

We have examined the other claims of error and find none meriting further discussion.

The judgment is affirmed.