## UNITED STATES v. MROZ.

### No. 8207.

Circuit Court of Appeals, Seventh Circuit.

June 3, 1943.

Rehearing Denied July 2, 1943.

222

Perry J. Stearns, of Milwaukee, Wis., for appellant.

Carl R. Becker, Asst. U. S. Atty., and B. J. Husting, U. S. Atty., both of Milwaukee, Wis., for appellee.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

EVANS, Circuit Judge.

This appeal involves a conviction for violation (Sec. 311 of 50 U.S.C.A.Appendix) of an order of a local (Milwaukee) draft board to defendant to report for transportation "for work of national importance, as a conscientious objector,"

which order was issued under authority of the Selective Service Act. (50 U.S.C.A. Appendix, § 301.)

A jury trial resulted in a verdict of guilt, upon which a sentence of four years' imprisonment was imposed. Defendant is a member of the Jehovah's Witnesses society and claims the draft exempt status (IV-D) of a "minister" instead of the classification (IV-E) of a conscientious objector. The indictment was returned October 1, 1942, for violation of an order to report on July 20, 1942.

When defendant first registered for the draft he stated in his questionnaire, dated May 21, 1941, that he was working as a joiner for a shoe company, and he was classified as I-A. He claimed IV-D exemption as a minister. He also filled out the special form given to conscientious objectors. In 1943, at the time of trial, he was 32 years of age.

He appealed his I-A classification, February 28, 1942, and his case was forwarded to the state headquarters for review and then to the District Appeal Board in Milwaukee. The Board, pursuant to statute, referred the case to the Department of Justice whose "hearing officer," before whom defendant appeared at a two hour hearing, recommended a reclassification of defendant to IV-E (conscientious objector), and the Appeal Board unanimously so reclassified him, and a direction was issued to the local board to order defendant to report for transportation to a camp for conscientious objectors.

The Board issued such an order on July 8, 1942, directing defendant to report on July 20 for transportation to a conscientious objectors' camp in Michigan. It was this order, concededly received by defendant, which he refused to comply with and which failure on his part is the basis of this criminal prosecution and conviction.

Defendant's history as a member of the Jehovah's Witnesses sect is as follows: He first joined the society in 1937, at which time he was working full time in a shoe factory where he continued to work until the end of the year 1941. He went to the society's school for three years. He was promoted[1] in rank until February 1, 1942, when he became a "pioneer" which meant that he was a full time preacher. It seems that according to the society's tenets, a

member is a "minister" from the very time he joins the faith, that is, to use the expression of the sect, when he makes his covenant with God. Such person may be and often is under ten years of age. But it was not until February 1, 1942, that defendant achieved his asserted status of a minister, as that term is generally used. In other words, he did not become a minister until after his draft board had classified him as I-A. He says he sought to notify the board of his new and exempt status, but the board refused to consider it on the ground that the matter was pending on appeal, and the file was out of its hands. The board member did not admit this, but said he could not remember such an incident.

The evidence discloses that all religious sects submit to General Hershey, Director of Selective Service, a list of their respective "ministers" (the Jehovah's Witnesses sect submits only a list of its "pioneers" and a few others of high rank). It does not list all of its members who "have covenants with God." These lists, thus received, are distributed by General Hershey to the states, and are there consulted whenever a claim of exemption is made. The Wisconsin list was consulted in this case, and defendant's name did not appear on it. The Appeal Board and the referee appointed to hear his case denied him the status of IV-D.

Defendant's contentions are: (1) He did not have a fair and impartial hearing by the local draft board or in the District Court (because of prejudicial statements of the District Judge and the District Attorney). (2) The question of whether he had a hearing in conformity with "due process" was a jury question, and the trial court here refused to submit that question to the jury. (3) The indictment was returned by a grand jury after the expiration of the term at which it had been impaneled. (4) The Selective Service Act is unconstitutional.

The oral argument of counsel at the hearing before this court was vehement in deriding the Selective Service Act and its administration. He contended, among other things, that military service constituted slavery and involuntary servitude in violation of the Thirteenth Amendment to the Constitution. To a greater degree, he argued, was the Selective Service Act

---

[1] He was made an Asst. Conductor or preacher in 1938, and in 1939, a Full Director or Chief Captain and then a Back Call Servant.

violative of Amendment XIII and more clearly constituted involuntary servitude when applied to "a minister" who had conscientious objections to war, yet was sent to a camp *without pay*.

*Expiration of Term of Court.* Defendant argues that the term of court at which the grand jury was called had closed before the indictment in question was returned. In other words, the authority of the grand jury to act ceased before it voted the indictment against defendant.

The appellant relies on this court's decision in United States v. Johnson, 7 Cir., 123 F.2d 111. While this case is still pending in the U. S. Supreme Court, 63 S.Ct. 912, 87 L.Ed. ——, it is readily, in point of fact, distinguishable from the case before us. It may therefore be dismissed without a consideration of its holding.

■ Counsel's argument is predicated upon the assumption that the statutory January Term[2] of court at Milwaukee terminated because the statutory terms of court at Oshkosh and Green Bay, begin in June and April, respectively, and since there is but one judge to hold all three courts and he can be in but one place at a time, the term of court at one place must ex necessitae close in order that the term at the next designated place may begin.

This argument has been before several courts and rejected by all. In 1910, the Supreme Court said, in Harlan v. McGourin, 218 U.S. 442, 31 S.Ct. 44, 48, 54 L.Ed. 1101, 21 Ann.Cas. 849,

"We think the purpose of the law was to provide for statutory terms of court for the northern district of Florida, beginning on the first Monday of February and March, respectively, which term should continue until the beginning of the next term, *unless finally adjourned in the meantime.* Such is the general and recognized practice in the circuit courts of the United States. * * *

"There was certainly no adjournment of the court for the term when the judge was absent, holding court at Tallahassee, or was out of the state." (Italics ours.)

In United States v. Perlstein, D.C., 39 F.Supp. 965, 968, Judge Maris stated:

"The conclusion has uniformly been reached that unless sooner adjourned sine die a stated term of court regularly opened at a time and place fixed by statute continues until the time fixed by law for the convening of the next term at the same place even though a term has commenced in the meantime at another place in the district. (citing cases.)" This case was affirmed without passing on this point in 3 Cir., 126 F.2d 789, certiorari denied, 316 U.S. 678, 62 S.Ct. 1106, 86 L.Ed. 1752.

And in United States v. Rasmussen, 10 Cir., 95 F.2d 842, 843, the court said:

"A term of court does not automatically expire until the time fixed by law for the convening of the next term *at that place,* unless an order is entered expressly adjourning it sooner, even though terms may begin at other places in the meantime." (Italics ours.)

■ The distinction which appellant attempts to make as to these and other cases,[3] namely, that there may have been a plurality of judges in such districts whereas in Wisconsin there is but one judge in the district, is unimportant, when it comes to construing the statutorily designated terms, having a specific commencement but no fixed termination. The aim of the statute was to provide a definite time for judicial service in each community having need of it, not to automatically terminate by inference a term expressly and specifically created by the same statute.

■ On the merits of this appeal a mere listing of appellant's grounds for reversal suggests triviality of merits.[4] It

[2] 28 U.S.C.A. § 195.

[3] Bronson v. Schulten, 104 U.S. 410, 415, 26 L.Ed. 797; East Tennessee Iron Co. v. Wiggin, 6 Cir., 68 F. 446; Petition of Thames Towboat Co., D.C., 23 F. 2d 493; Denver Livestock Co. v. Lee, 8 Cir., 18 F.2d 11, 13; Florida v. Charlotte Harbor Co., 5 Cir., 70 F. 883.

[4] The trial judge was biased. The appellant cites statements of the judge, without relation to their text and attempts to twist their meaning into being prejudicial. We have read the entire

record before us (it is rather a small record, in narrative form) and we fail to find any evidence, in fact not a semblance, of prejudice on the part of the trial judge.

We assume, although it is of no significance here, that a trial judge may have great contempt for a litigant (in a civil or a criminal case) and even greater abhorrence for the crime charged against him, yet accord the accused all the rights of an innocent party. It is not what the judge may think of the defendant in these

must be borne in mind that the charge upon which the criminal sentence was imposed was a failure to obey an order of his local draft board for transportation to a conscientious objectors' camp. That appellant received the order, is conceded; that he intentionally disobeyed the order is clear. The Board issued its order only after it had been directed so to do, following an appeal of his case by appellant.

We can not ignore the seriousness of the issues which defendant presents. His challenge, if successful, would jeopardize the country's defense in time of war. That may have been defendant's object, or his action may have resulted from an over exaltation of self and minimization of the obligation of a citizen to society. Whatever his mental reaction to a war status may have been, the result is the same. Defiance of the authority of the state by the citizen has resulted in a test of that authority and a resulting expression of duty and obligation of citizen to his government.

That such expression of government and of citizen duty may be old and well recognized among nearly all good citizens of the land seemingly counts for little with those who write in large letters the duty of government to preserve itself and protect its citizens in time of war, but to exact nothing from citizens whose personal interest or convictions are not in accord with the government's adopted policy.

Defendant filled in his questionnaire claiming exempt status as a minister. It was denied. He appealed. A hearing was had. He was heard. At the close of his hearing he was granted the status of a conscientious objector. He was refused the status of a minister.

█ It appeared that there is a "working arrangement" whereby the names of "ministers" of all creeds are supplied the draft authorities. The Jehovah Witnesses Society supplied such a list (naming not all members of the sect, but the ones who have "pioneer" or superior status) and appellant's name was not on the list of names so furnished. This may have been the reason he was denied "minister" classification. It may be true that members of Jehovah's Witnesses *immediately upon joining the sect become "ministers,"* i. e., exhorters of their particular faith, but they do not become the "minister" that Congress had in mind when it enacted the Selective Service Act. Congress divided those opposed to participation in war effort because of so-called conscientious objections, into two groups.

One group consisted of what are called ministers. They, of course, were also required to assert conscientious objections to war service. The other group entertains

---

draft evasion cases, but did he keep his opinion to himself and rule as a judge trying one accused of crime, and presumed to be innocent, must rule.

The argument of the District Attorney was said to be unfair. No statements of the District Attorney, as being prejudicial, are cited, which have not been held to be proper. We need not elaborate for the rulings are elementary.

The indictment is criticized because vague. It is said to be void because it is not alleged the work is of "national importance," nor does it allege his knowledge of the commission of any crime, nor does it allege that the work at the camp would be under "civilian direction." The indictment is also said to be void because based on an unlawful delegation of power by Congress to the President and the Director of Selective Service; the order to report was invalid because made arbitrarily and without due hearing and under an Act not providing due process; the proceedings before the appeal board lacked due process; the Selective Service Act is void; the act is in effect a bill of attainder or ex post facto law; assignment of defendant to Civilian Public Service Camp is in effect attainder of treason; the conviction was erroneous because based on unreasonable search and seizure and requirement of self-incrimination (i. e., answering the questionnaire). Obviously, much of this attack is not properly based on the alleged vagueness of the charge. Generally speaking the Supreme Court has fully answered the objections in cases that came before it during the last World War. Arver v. United States (Selective Draft Law Cases), 245 U.S. 366, 38 S. Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Ann.Cas.1918B, 856; Goldman v. United States, 245 U.S. 474, 38 S.Ct. 166, 62 L. Ed. 410; Cox v. Wood, 247 U.S. 3, 38 S. Ct. 421, 62 L.Ed. 947; Ruthenberg v. United States, 245 U.S. 480, 38 S.Ct. 168, 62 L.Ed. 414; United States v. Macintosh, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302; United States v. Williams, 302 U. S. 46, 58 S.Ct. 81, 82 L.Ed. 39; Hamilton v. Regents, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343. The law is well settled by these decisions and the objections are rejected as frivolous.

the same objections to war, but were not ministers. The latter is given exemption less favorable than the other.

At once the question arises, What is meant by the word "minister"? Surely it could hardly be said that every Jehovah's Witness, because he "has made a covenant with God," is a minister, within the meaning of the statute. The officers of the Jehovah's Witnesses did not so construe the word "minister." Neither did the Government. Nor do we.

█ While it is not necessary to examine the evidence or to weigh it to ascertain whether in truth and fact defendant was a minister, yet we have done so to ascertain the good faith of defendant. The law gave to defendant a right to appeal from the ruling of the local draft board. He exercised that right. He was given a hearing. He had a right to have the matter referred by the appeal board to the Department of Justice. This hearing was also given him by the statute, and he received such a hearing. The statute makes such decision final. It follows that he was not entitled, in this criminal case, to attack that finding.[5] It was final both for him and the Government. It was not review-able by any court or official save as there was a division in the appeal board, in which case the draftee might appeal to the President of the United States.

█ However, assuming the attack could have been made, the evidence amply supported the finding. This evidence consisted of the failure of the officers of the Jehovah's Witnesses to recognize him as a minister and his own failure to make claim to the asserted full-time ministerial status until after the draft board had notified him of his I-A status.

Appellant's clear and unqualified duty was to comply with his draft board's order. He can not "take the law into his own hands" and render himself invulnerable to consequences. The draft machinery has been legally[6] set up, and it is not for the individual to constitute himself judge of his own case.

Other circuits have dealt with similar questions. Judge Parker of the Fourth Circuit dealt with a similar case in Baxley v. U. S., 4 Cir., 134 F.2d 998 decided April 8, 1943.

█ In the margin are set forth additional quotations of pertinent authorities.[7]

---

[5] Bowles v. United States, decided by the Supreme Court, May 3, 1943.

[6] 50 U.S.C.A. Appendix, § 301 et seq.

[7] United States v. Kauten, 2 Cir., 133 F.2d 703, 706.

"Indeed it has become the general rule that where Congress has delegated to an administrative authority a certain field of governmental activity and made its acts final, the courts will not interfere until the administrative proceedings have been concluded and any administrative remedy that may exist has been exhausted. Under this rule there would seem to have been no good reason for interrupting proceedings leading to induction until some substantial physical restraint occurred. Then the writ of habeas corpus is sufficient to remedy any irregularities of Draft Boards and to satisfy all reasonable scruples on the part of inductees. Moreover, it is the practice of the Army to grant a furlough of seven days after a registrant is formally inducted before he is subjected to military training. This gives him time to apply for a writ of habeas corpus without disturbing the selective service machinery, if he thinks that his rights as a conscientious objector have been infringed.

"It results from the foregoing that the registrant was bound to obey the order to report for induction even if there had been error of law in his classification. The Administrative Board had jurisdiction of his case and its order could not be wilfully disregarded." (Italics ours.)

Seele v. United States, 8 Cir., 133 F. 2d 1015, 1021.

"The contention of appellant is that this showing conclusively established that he is a minister, both regular and ordained, within the purview of the Selective Service Act, and that in reversing this case the judgment of the courts should be substituted for that of the Boards created by that Act as the final fact-finders under its provision. * * * it is the generally accepted rule that, under the Selective Training and Service Act, no review of findings of Local Draft Boards upon any classification or the denial of exemption is committed to the courts, and relief may be granted the registrant only when the Local Draft Board has acted arbitrarily and capriciously and without substantial evidence."

United States v. Grieme, 3 Cir., 128 F. 2d 811, 815.

" * * * The registrant may not, however, disobey the board's orders and then defend his dereliction by col-

The Act itself (50 U.S.C.A.Appendix, § 310(a) (2) provides:

"The decision of such local boards shall be final except where an appeal is authorized in accordance with such rules and regulations as the President may prescribe."

Appellant dwells on lack of a due process hearing, and on arbitrary and capricious action. He seemingly fails to realize that war is realistic, that the emergency requires immediate mobilization of a large manpower; that each case must be handled individually yet speedily. The Act provides for the administrative set up to handle this titanic task expeditiously. Each individual answers his questionnaire, and can supplement it with any other evidence he wishes to present in support of his claimed exemption. If the Board's ruling be adverse to him, he may appeal, as appellant did, and the Regulations provide for a reference in the case of conscientious objectors. Such a reference was had, and an extended hearing took place in which appellant participated.

It was determined by that referee and by the Appeals Board, unanimously, that appellant should be classed as a conscientious objector but not as a duly ordained minister. The authorized administrative machinery passed upon this man's case individually and concluded he was not a minister within the meaning of the Act, but, since he was opposed to combatant and non-combatant service, he should be considered a conscientious objector. He received all the consideration the emergency of the situation permitted, and the administrative tribunals' decisions have placed him in a category where his valued life is safer than that of many of his fellow citizens.

We are confident (at least we are hopeful) that mature reflection will cause a modification of counsel's opinion of the Selective Service Act and its administration. It is hard to conceive of any government at war dealing more considerately with its citizens who express conscientious objections to war, and especially is this so, where the citizen for the first time voiced such sentiment and claimed to be a full-fledged minister after war was declared, and he had been called by the draft.

Judgment is affirmed.

laterally attacking the board's administrative acts."

Rase v. United States, 6 Cir., 129 F.2d 204, 207.

"No power to review any classification, or the denial of an exemption, is conferred upon the courts. * * *

"The phrase 'minister of religion' as used in the Act is to be interpreted according to the intention of the Congress, and not by the meaning attached to it by the members of any particular group. Congress undoubtedly intended to exempt such persons as stand in the same relationship to the religious organizations of which they are members, as do regularly ordained ministers of older and better known religious denominations. * * *

"No question of religious liberty, in any true sense, is here involved, and the zealous and ill-advised pursuit of a martyr role is not, by the sanction of the Constitution, permitted to imperil national safety without the preservation of which, liberty of conscience and religion will everywhere disappear."

See also, Buttecali v. United States, 5 Cir., 130 F.2d 172; Goff v. United States, 4 Cir., 135 F.2d 610, decided May 4, 1943; Honaker v. United States, 4 Cir., 135 F.2d 613, decided same day by the same circuit; Johnson v. United States, 8 Cir., 126 F.2d 242; Fletcher v. United States, 5 Cir., 129 F.2d 262.