## KRAMER et al. v. UNITED STATES.

### No. 9812.

Circuit Court of Appeals, Sixth Circuit.

Feb. 8, 1945.

Writ of Certiorari Denied April 23, 1945.

See 65 S.Ct. 1026.

John A. Chamberlain, of Cleveland, Ohio, for appellants.

Francis X. Feighan, of Cleveland, Ohio (Don C. Miller and Francis X. Feighan, both of Cleveland, Ohio, on the brief), for appellee.

Before HICKS, SIMONS, and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

The six appellants, whose cases by their consent were tried jointly in the United States District Court for the Northern District of Ohio, were convicted in a trial by jury of wilful and felonious failure to perform duties required of them by the Selective Training and Service Act of 1940, and the lawful Rules and Regulations issued pursuant thereto. Each was sentenced to five years imprisonment.

All were male citizens of the United States within the age classification subjecting them to the duties prescribed by the Act, were duly registered pursuant to its provisions, and had been allowed by their respective Selective Service Boards their claimed exemptions from combatant and non-combatant training and service in the land or naval forces of the United States. They had been classified in Class IV-E, as conscientious objectors, and had been assigned to work of national importance under civilian direction, in conformity with the promulgated rules and regulations. Pursuant to the power lawfully vested in him, the Director of Public Service eventually designated Camp No. 23 at Sherrodsville, Carroll County, Ohio, as the Civilian Public Service Camp where the work of national importance to which they had been assigned would be performed.

At a time when millions of their fellow countrymen were engaged in gruelling combat with the enemies of civilization on land and sea and in the air, and legions of the best of America's manhood were rendering to God and to Country "the last full measure of devotion," these six able-bodied young males were detailed to the comparatively soft work of soil conservation and tree planting in a civilian camp, in fullest indulgence of their asserted religious opposition to participation in warfare, though fought not from the free choice of a nation bent upon conquest, but in necessary defense of its survival and the preservation of the very religious freedom under which these favored few had claimed and received the highest special privilege.

Yet, these six males bolted the civilian camp; or, as put in the indictment, in June and July, 1943, each left the camp to which he had been assigned "without being released or transferred by proper authority and not in performance of assigned duties or authorized missions and without leave outside of said camp; contrary to the provisions of the Selective Training and Service Act, and as amended, 54 Stat. 885, 50 U.S.C.A.Appendix, § 301, et seq., and the Rules and Regulations issued pursuant thereto,[1] and against the peace and dignity of the United States."

To summarize the assignments of error,

---

[1] Executive Order No. 8675, dated February 6, 1941 (1941 Supp., Titles 1–7, Code of Fed. Reg. of the U. S. A.):

"By virtue of the authority vested in me by the Selective Training and Service Act of 1940 (Pub. No. 783, 76th Cong.), it is hereby ordered as follows:

"1. The Director of Selective Service, hereinafter called the Director, is authorized to establish, designate, or determine work of national importance under civilian direction to which may be assigned persons found under section 5(g) of the Selective Training and Service Act of 1940 to be conscientiously opposed to participation in combatant and non-combatant training and service in the land or naval forces of the United States.

"2. The Director shall make the necessary assignments to such work, shall determine the agencies, organizations, or individuals that may provide civilian direction thereof, and shall have general supervision and control over such work.

"3. To the extent that he may deem necessary to carry out the provisions of this order, the Director may utilize the services of the Departments, officers, and agents of the United States; accept the services of officers and agents of the several states, territories, and the District of Columbia, and the subdivisions thereof;

appellants contend that the indictments under which they were tried and convicted charge no criminal offense; that the rules and regulations which they admittedly violated were unconstitutional, null and void, and contrary to the Act of Congress relating to conscientious objectors; that the camp to which they were assigned was under military and not civilian direction; and that there is nothing in the Act of Congress which authorizes regulations requiring conscientious objectors to remain in the camp to which they are assigned or to keep their persons, clothing, equipment and quarters neat and clean.

They expand their grievances to embrace compulsory work without pay, leaving their dependents "deprived of protection"; assignment to work under military and not civilian supervision and direction; deprival of religious freedom; subjection to participation in the military and war effort; involuntary servitude; and cruel and unusual punishment.

Setting themselves up as final arbiters of their own rights, they deserted their duties in the work of national importance to which they had been assigned by lawfully constituted authority. They ask this court to reverse their conviction and sentence to penal servitude for civilian-camp desertion, for no better excuse than would justify, in wartime, a deserting soldier to be shot.

The arguments which they press are not new. All too often the jurisdiction of our Nation's courts has been invoked to meet these extreme insistences upon religious freedom as paramount to every public duty owed the Nation which guarantees its existence. The United States Courts have left little to be said in the context.

---

and accept voluntary services of private organizations and individuals; and may obtain, by purchase, loan, or gift, equipment and supplies from Federal and other public agencies and private organizations and individuals, with or without advertising or formal contract.

"4. The Director is authorized to prescribe such rules and regulations as may be necessary to carry out the provisions of this order."

Selective Service Regulations, amended by Amendment No. 143, effective April 3, 1943 (8 Fed. Reg. 4291):

Para. 653.1 Selective Service Reg., Sec. Edition:

"653.1 (Page 653.3 Reg.) (a) The Director of Selective Service is authorized to establish, designate, or determine work of national importance under civilian direction. He may establish, designate, or determine, by an appropriate order, projects which he deems to be work of national importance. Such projects will be identified by number and may be referred to as 'civilian public service camps.'

"(c) The responsibility and authority for supervision and control over all work projects is vested in the Director of Selective Service."

Para. 653.2 Selective Service Reg., Sec. Edition:

"(a) The Director of Selective Service may arrange for the establishment of a camp at any project designated as work of national importance under civilian direction.

"(c) The Director of Selective Service may authorize the National Service Board for Religious Objectors, a voluntary unincorporated association of religious organizations, to operate camps. The work project for assignees of such camps will be under the civilian direction of a technical agency. Such camps and work projects shall be operated under such camp rules as may be prescribed by the Director of Selective Service."

Para. 652.1 Selective Service Reg., Sec. Edition:

"(a) When a registrant in Class IV-E has been found to be acceptable for work of national importance under civilian direction, the local board shall immediately notify the Director of Selective Service on a Conscientious Objector Report (Form 48) that the registrant is so acceptable and is available for assignment to work of national importance under civilian direction."

Par. 652.2 Selective Service Reg., Sec. Edition:

"(a) The Director of Selective Service * * * shall assign the registrant to a camp."

Sec. 653.12, 8 Fed. Reg. 4291:

"Assignees shall report to the camp to which they are assigned; remain therein until released or transferred elsewhere by proper authority, except when performing assigned duties or on authorized missions or leave outside of camp; perform their assigned duties promptly and efficiently; keep their persons, clothing, equipment, and quarters neat and clean; conserve and protect government property; conduct themselves both in and outside of the camp so as to bring no discredit to the individual or the organization; and comply with such camp rules as may be prescribed or such directions as may be issued from time to time by the Director of Selective Service."

■ Notwithstanding the constitutional right of a person to live and work where he will, the Supreme Court has declared that "he may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country, and risk the chance of being shot down in its defense." Jacobson v. Massachusetts, 197 U.S. 11, 29, 25 S.Ct. 358, 362, 49 L.Ed. 643, 3 Ann.Cas. 765.

In pronouncing the unanimous opinion of the Supreme Court upholding the Selective Draft Law of May 18, 1917, Ch. 15, 40 Stat. 76, 50 U.S.C.A.Appendix § 201 et seq., Chief Justice White said that the court was "unable to conceive upon what theory the exaction by government from the citizen of the performance of his supreme and noble duty of contributing to the defense of the rights and honor of the nation, as the result of a war declared by the great representative body of the people, can be said to be the imposition of involuntary servitude in violation of the prohibitions of the Thirteenth Amendment." Selective Draft Law Cases (Arver et al. v. U. S.), 245 U.S. 366, 390, 38 S.Ct. 159, 165, 62 L.Ed. 349, L. R.A.1918C, 361, Ann.Cas.1918B, 856.

■ In United States v. Macintosh, 283 U.S. 605, 621, 623, 625, the Supreme Court quoted with approval its expression in United States v. Schwimmer, 279 U.S. 644, 651, 49 S.Ct. 448, 73 L.Ed. 889, that "the influence of conscientious objectors against the use of military force in defense of the principles of our government is apt to be more detrimental than their mere refusal to bear arms"; and declared that whether any citizen shall be exempt from service in the armed forces of the Nation in time of war is dependent upon the will of Congress and not upon the scruples of the individual, except as Congress provides. Mr. Justice Sutherland added with emphasis that "we are a nation with the duty to survive; a nation whose Constitution contemplates war as well as peace; whose government must go forward upon the assumption, and safely can proceed upon no other, that unqualified allegiance to the nation and submission and obedience to the laws of the land, as well those made for war as those made for peace, are not inconsistent with the will of God." The four dissenting Justices, in denying the right of the United States to exact a promise to bear arms as a prerequisite to naturalization, notwithstanding religious or conscientious scruples, conceded that when one's belief collides with the power of the state, the latter is supreme within its sphere and submission or punishment follows. [283 U.S. 605, 633.]

■■ In Hirabayashi v. United States, 320 U.S. 81, 93, 63 S.Ct. 1375, 1382, 87 L. Ed. 1774, the Chief Justice pointed out that since the Constitution commits to the President and to the Congress the exercise of the war power in all the vicissitudes and conditions of warfare, wide scope for the exercise of judgment and discretion is necessarily granted; that the war power of the national government is "the power to wage war successfully"; is not restricted to the winning of victories in the field and the repulse of enemy forces; but extends to every matter and activity so related to war as substantially to affect its conduct and progress. See also Ex Parte Quirin, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3.

■ The Supreme Court has declared that legislation must be often adapted to conditions involving details with which it is impracticable for the legislature to deal directly; and that the Constitution does not deny to Congress "the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply." Currin v. Wallace, 306 U.S. 1, 15, 59 S.Ct. 379, 387, 83 L. Ed. 441; Panama Refining Co. v. Ryan, 293 U.S. 388, 421, 55 S.Ct. 241, 79 L.Ed. 446. See also Wayman v. Southard, 10 Wheat. 1, 43, 6 L.Ed. 253; McKinley v. United States, 249 U.S. 397, 39 S.Ct. 324, 63 L.Ed. 668.

■ In the setting of the instant case, we do not find United States v. Chicago, etc., R. Co., 282 U.S. 311, 328, 51 S.Ct. 159, 75 L.Ed. 359, cited by counsel for appellants, remotely apposite. Nor do we find any merit in the argument that the camp to which appellants were assigned was under military, rather than civilian, direction. From the narrative bill of exceptions, it appears that the four government witnesses, namely, the camp director, the acting assistant director, the superin-

tendent in charge of soil conservation, and an assistant forester, all testified that the actual work performed in the camp was in charge of a civilian. As against this evidence, the defendant Nelson testified merely that "the camp was under regulations handed down by military authority"; the defendant Bristah testified that "the regulations governing camp were sent out under signatures of military officers"; and the defendant Magraw testified that Colonel Kosh inspected the camp in military uniform, that both he and General Hershey, the Director of Selective Service, were on active military duty, and that both were administrative officers for the Civilian Public Service Camps, which were "under military, not civil control."

A fair evaluation of the evidence of record clearly justifies the conclusion that the appellants have in no manner been mistreated, and that the Civilian Public Service Camp to which they were assigned was under civilian and not military direction. Persons assigned to these camps are not subject to the Articles of War, as evidenced by the very fact that the prosecutions in these cases, for violation of camp regulations, were instituted in a United States District Court. In his capacity as Director of Selective Service, General Hershey is directly responsible to the President, who, pursuant to the Act of Congress, appointed him by and with the advice and consent of the Senate. Though a general in the United States Army, he was, by Special Order 231 of the War Department, detached from that Department and assigned to the Selective Service System; and was later appointed by the President, with the confirmation of the Senate, to succeed a civilian, Dr. Clarence Dykstra, as Director of Selective Service. He is plainly serving in such capacity as a civil and not as a military officer. See Southern Pacific Co. v. United States, 285 U.S. 240, 52 S.Ct. 324, 76 L.Ed. 736.

The fact that appellants were sentenced to the maximum term of penal servitude within the limits of the statute does not constitute cruel and unusual punishment within the inhibition of the Constitution. See Johnson v. United States, 8 Cir., 126 F.2d 242, 251. Compare Bogy v. United States, 6 Cir., 96 F.2d 734, 741; Schultz v. Zerbst, 10 Cir., 73 F.2d 668, 670.

Thus far, we have considered only opinions of the Supreme Court for derivation of the governing principles. It should now be stated that the Courts of Appeals have, with unanimity in the circuits, upheld convictions of conscientious objectors for violation, in varying ways, of the Selective Training and Service Act of 1940. Weightman v. United States, 1 Cir., 142 F.2d 188; United States v. Kauten, 2 Cir., 133 F.2d 703, 706; United States v. Grieme, 3 Cir., 128 F.2d 811, 815; Baxley v. United States, 4 Cir., 134 F.2d 998; Heflin v. Sanford, 5 Cir., 142 F.2d 798; Rase v. United States, 6 Cir., 129 F.2d 204, 210; United States v. Van Den Berg, 7 Cir., 139 F.2d 654; Seele v. United States, 8 Cir., 133 F.2d 1015, 1021; Crutchfield v. United States, 9 Cir., 142 F.2d 170; Roodenko et al. v. United States, 10 Cir., 147 F.2d 752. It would be needless repetition to rewrite the rationalization of all these opinions. Mere reference to them should suffice. An interested reader will find that our decision in the present justiciable controversy conforms to these authorities.

Weightman v. United States, supra, bears close resemblance to the case at bar. There, the defendant, who had been classified in IV-E and assigned to work of national importance in a Civilian Public Service Camp, refused to cut trees to improve the stand of timber and perform work of like nature in White Mountain National Forest under supervision of the United States Forest Service on the ground that it was not work of national importance. He was indicted, tried and convicted under Section 11 of the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix § 311. The Circuit Court of Appeals for the First Circuit upheld his conviction and sentence; and, in an able opinion by Judge Woodbury, rejected the arguments which have been made here.

In Roodenko v. United States, 147 F.2d 752, supra, the Court of Appeals for the Tenth Circuit recently met the same arguments presented here and arrived at the same conclusion which we have reached.

In United States v. Mroz, 7 Cir., 136 F.2d 221, 226, where the defendant, a conscientious objector, violated an order of his local draft board to report for transportation for work of national importance, his conviction was affirmed. The pithy comment of Judge Evans seems pertinent: "The draft machinery has been legally set up, and it is not for the individual to constitute himself judge of his own case."

See also the opinion of this distinguished jurist in United States v. Gormly, 7 Cir., 136 F.2d 227.

It is long past high-time that able-bodied young male citizens of the United States, who claim that their religious convictions prevent their taking up arms in defense of the Nation which guarantees them religious freedom, should learn that they cannot flaunt to the extent of disobedience of law their exemption from military service, accorded because of their peculiar beliefs, which, if held by more than a modicum of American manhood, would result in the destruction of our country and the enslavement of our people.

The judgment of the district court is affirmed.