## UNITED STATES v. EMERY.

### No. 182, Docket 20875.

Circuit Court of Appeals, Second Circuit.

June 3, 1948.

Margaret Connors Driscoll, of Bridgeport, Conn., for appellant.

Adrian W. Maher, U. S. Atty., of Bridgeport, Conn., and Thomas J. Birmingham, Asst. U. S. Atty., of Hartford, Conn., for appellee.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

Upon stipulated facts after a jury had been waived the district court found the defendant guilty of violating the Selective Training and Service Act of 1940, 50 U.S. C.A.Appendix, §§ 311 and 305(g), and sentenced him to six months' imprisonment. The particular charge was that the defendant had refused to continue performance of the civilian work of national importance to which he had been assigned as a conscientious objector. He had registered with his local draft board in Portland, Maine, as a conscientious objector, and,

being classified as such, had been assigned by the Director of Selective Service in July, 1943, to Civilian Public Service Camp No. 32 in West Compton, New Hampshire. Three months later, under Administrative Directive No. 21 of the regulations governing camp operations of the Selective Service System, he was transferred to "detached service," doing dairy herd testing. For this purpose he was assigned in November, 1943, to the Dairy Herd Improvement Association of Fairfield County, Connecticut, a branch of the Fairfield County Farm Bureau. His work was to test the cows belonging to the farmer members of the Association to determine the quality and quantity of milk given by these cows. He covered seventeen farms in all, with herds varying from two to eighty cows. He usually tested about thirty cows a day and kept the necessary records. His working day began with the milking time of the farm he was visiting on the day in question and ended with the last milking time for the last farm on his schedule for the day, i. e., beginning from 4:30 to 6:30 a. m. and ending from 4:00 to 5:30 p. m. He had five days off each month. He continued in this work from November, 1943, until July 4, 1945, when he refused to do so further because of his objections, hereinafter stated, to the arrangements for his pay. His indictment and conviction then followed.

The Dairy Association is an organization of private farmers who through the Association paid a wage to the Government for Emery's work and provided laundry service for him, his testing equipment, and any additional expenses beyond his board and living quarters, such as telephone bills and automobile expenses. His board and lodging were furnished by the farmer whose cows he was testing at the time. The amount paid for his services, in addition to his board and room, varied from $125 to $150 a month. The amount allotted to him by the Government was $15 a month. The balance, after deducting this sum, together with the cost of his maintenance (auto, telephone, and equipment), medical expenses, and insurance, and averaging $50 a month, was held in a separate fund in the United States Treasury with all other moneys for conscientious objectors assigned to such detached service.

In doing this work the defendant's technical assignment for administrative purposes was to "CPS Camp 100," although there was and is in fact no physical area or buildings or location within whose confines he was compelled to stay, as had been the case when he was in the camp at West Compton, New Hampshire. The authority for organizing these camps is Executive Order Feb. 6, 1941, No. 8675, under the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 310, and the regulations, which may be found quoted in Kramer v. United States, 6 Cir., 147 F.2d 756, certiorari denied 324 U.S. 878, 65 S.Ct. 1026, 89 L.Ed. 1429. Under one of these regulations, 32 CFR, Cum.Supp., § 653.3(e), it is provided: "The Director of Selective Service is authorized to pay assignees in Government-operated camps. The pay of assignees shall not be more than $5 per month except that not to exceed 6 per cent of the assignees may be paid not more than $7.50 per month. The Director of Selective Service is also authorized to provide subsistence, proper clothing for the performance of their duties, and such other personal supplies or equipment as he deems necessary for assignees in Government-operated camps, without expense to such assignees." The Appropriation Act for 1943, which provides amounts for this program "of work of national importance under civilian direction," also states, "and including also the pay and allowances of such individuals at rates not in excess of those paid to persons inducted into the Army under the Selective Service System, and such privileges as are accorded such inductees." Pub.L. No. 630, Act of June 27, 1942, 56 Stat. 416.

On July 3, 1945, defendant addressed letters to the National Selective Service Headquarters, Washington, D. C., and the United States District Attorney at New Haven, Connecticut, which, although referred to, are not specifically set forth in the record before us. Their substance, however, was reviewed at the trial, showing that in them he took the position which

he has since maintained to the effect that his assignment to war work at a wage less than the prevailing wage in the county or area was unconstitutional and in violation of the First and Fifth Amendments to the Constitution. He points to Administrative Directive 21 concerning "Use of Assignees to Relieve the Shortage of D.H. I.A. Herd Testers," which states:

"2c. Employers to whom assignee labor is made available, must pay the prevailing wage of the county or area in which the work is performed. Such wages after deduction of certain expenses, enumerated later, are remitted to the Selective Service System through the National Service Board for Religious Objectors for coverage into the Treasury of the United States where they are segregated in a special account which will be held intact until the termination of hostilities."

We may properly assume the sincerity in the defendant's protest which his counsel asserts, and indeed have some sympathy with his grievance. True, we have no showing before us of the reasons why this substantially onerous work should result in the piling up of a fund in the United States Treasury, with the payment of only a small pittance to the worker. Further, we do not know of any particular way in which he could express his grievance beyond protest to the proper authorities and claim for the additional funds. Seemingly, since the fund is being kept segregated in the Treasury, the authorities have not made a final disposition of it.

But, even if we assume validity to his grievance, we think he is limited to such form of protest and claim as he can make; nor do we see how refusal to do the work required, as clearly set forth in the initial Act itself and the valid regulations under it, can be treated as a justifiable means of seeking redress. The va-lidity of the regulations for this type of service has been upheld in a series of cases, indeed all the cases which have arisen under this provision of the law, including Kramer v. United States, supra, and Brooks v. United States, 2 Cir., 147 F.2d 134, certiorari denied 324 U.S. 878, 65 S. Ct. 1027, 89 L.Ed. 1430.[1] Defendant asserts that these cases upheld only the general regulations for service by conscientious objectors in the work camps there provided and did not cover specifically the type of work in which he was engaged or the situation in which he found himself, where, although the farmers for whom he worked directly were required to pay the prevailing wage, yet he received only a small portion thereof. But we think the upholding of the general provisions in these cases includes also details of the kind here involved. Apparently, as the prosecution asserts, the defendant, had he so desired, could have remained in the work camp and need not have volunteered for the detached service, the constitutionality of which he now challenges. Had he remained within the area of a work camp and there performed the required work of national importance, he would have received only $5.00 a month, unless he were a member of the group of not more than 6 per cent of the assignees who were allowed not more than $7.50 a month. It so happens, too, that in the Brooks case the defendant there, as one of the bases of his claim of unconstitutionality, squarely raised before this court the issue that the system of detached service for conscientious objectors was unconstitutional. Among other things, that defendant urged: "This appears to be a new form of contract labor by which the present assignees, like convicts, do required work for the benefit of those who will bid the highest, while the U. S. Treasury gets the wages." This court rejected the contention of illegality.

[1] See also United States ex rel. Zucker v. Osborne, 2 Cir., 147 F.2d 135, certiorari denied 325 U.S. 881, 65 S.Ct. 1574, 89 L.Ed. 1997; Hopper v. United States, 9 Cir., 142 F.2d 181; United States v. Mroz, 7 Cir., 136 F.2d 221, certiorari dismissed Mroz v. United States, 320 U. S. 805, 64 S.Ct. 23, 88 L.Ed. 487; Roodenko v. United States, 10 Cir., 147 F.2d 752, certiorari denied 324 U.S. 860, 65 S.Ct. 867, 89 L.Ed. 1418; United States v. Van Den Berg, 7 Cir., 139 F.2d 654; Weightman v. United States, 1 Cir., 142 F.2d 188; Wolfe v. United States, 6 Cir., 149 F.2d 391; Heflin v. Sanford, 5 Cir., 142 F.2d 798; United States v. Gormly, 7 Cir., 136 F.2d 227, certiorari denied Gormly v. United States, 320 U.S. 753, 64 S.Ct. 60, 88 L.Ed. 448.

We think it clear that the system of selective service, with its requirements of forced military service for selectees in general and of the substituted work of national importance for conscientious objectors, would not be operable if claimed harshnesses in detail could be contested by refusing any obedience to the system. Just as the soldier selectee cannot disobey commands, so the conscientious objector cannot refuse to perform his work of national importance even if he thinks he is being underpaid and acts on the basis of conscientious scruples to avoid what he considers the status of contract labor. The upholding of the selective service system as a whole, going back to the Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Ann. Cas.1918B, 856, in World War I, and cases such as United States v. Herling, 2 Cir., 120 F.2d 236, in the last war, including the cases above cited dealing with the provisions concerning conscientious objectors, carries with it the requirement of continued obedience to the established directives. Redress of the defendant's incidental grievances must be sought in other ways than by disobedience.

The defendant's argument took a wide range, so far in fact that we could not always follow it. The claim that the "power to confiscate wages or to conscript labor for the use of private employers" might be used to penalize freedom of religion and speech or to restrict unpopular beliefs assumes that enforcement will actually proceed against the very purpose of the original statute and the regulations. Until such a course is shown, the objection is certainly not valid. The claim that there is discrimination in that the wages thus paid were less than that paid privates in the Army overlooks the after all quite reasonable basis for a different classification of men in actual military service and men doing civilian or farm work even of national importance. On this record we do not see how the district court could have done otherwise than find the defendant guilty of the crime with which he was charged.

Affirmed.