## ALLEN v. COLBY & A.

The order of the President for arresting persons absenting themselves to avoid being drafted into the military service, issued in August, 1862, was authorized by the constitution and the act of Congress, and defendants to an action of trespass may justify an arrest made pursuant to that order.

If there was reason to suppose that one, who was absenting himself to avoid the impending draft, was concealed in a certain place, and his valise containing his wearing apparel was left at the place where he was supposed to be concealed, by his father, officers employed to arrest him would be justified in taking the valise and contents, and detaining them a reasonable time, if they thought he was secreting himself there to avoid the draft, and believed that by taking and detaining the articles, they would be able to secure his arrest; provided, they acted in good faith and solely for the purpose of effecting his arrest, though he was not then, in fact, concealed at that place, but had departed and escaped to Canada; and whether they so acted and believed is a question of fact for the jury.

TRESPASS for taking the plaintiff's valise and the wearing apparel in it, on the first of September, 1862.

Plea, the general issue, with the following statement: The plaintiff was a citizen of Guildhall, Vermont, between the ages of 18 and 45, and liable to be enrolled and drafted in that town. Troops had been called for by the President of the United States, and such measures had been taken by the general government and the government of Vermont, that the quota of that State and of the town of Guildhall had been ascertained. A draft had been ordered to take place on the 3d of September, and all citizens of Guildhall liable to draft had been enrolled, and among them the plaintiff, who thereby became liable to be drafted on the 3d of September. This draft was postponed to the 10th of September. The War Department, on the 8th of August, 1862, issued order No. 104, published on the 13th of the same month, which provided that any person liable to draft, who should absent himself from his county or State before the draft was made, should be arrested by any provost marshal or other United States or State officer, wherever he might be found within the jurisdiction of the United States. The plaintiff had left Guildhall, and was absenting himself from that town and the State of Vermont, to avoid the draft. The defendants, being civil officers in this State and county, and believing that the plaintiff was secreting himself in Northumberland, in this county, in order to avoid the draft, went to Northumberland for the purpose of arresting him; and not finding him, but finding his clothes, they took and detained them, as they lawfully might, for the purpose of securing his arrest.

The plaintiff moved the court to reject the brief statement, as not setting forth any legal defence, which the court declined to do, and the plaintiff excepted.

The plaintiff proved the taking of the property by the defendants. The defendants offered evidence that they were, one, the sheriff of this county, the other, his deputy; that they were applied to by the selectmen of Guildhall, and informed that the plaintiff was secreted in Northumberland, at the house of one Hawley, for the purpose of evading the draft and escaping to Canada. Whereupon they went to Hawley's house

for the purpose of arresting the plaintiff, and not finding him at Hawley's house, but finding the valise filled with clothing, which they were informed had been left there the night before for the plaintiff by his father, they took and detained the valise and contents. The defendants offered a copy of general order No. 104, authorizing the arrest of persons absenting themselves to evade the draft, as is set forth in the brief statement sent from the War Department to the adjutant and inspector general of Vermont, by him certified as a true copy; and a witness who testified that the copy offered was a true copy of the original on file in the adjutant and inspector general's office. To the admission of this copy the plaintiff objected, on the ground that there was no competent evidence of its being a true copy of the original order, and also that the order itself gave no legal authority for the defendants to act in the premises; but the court admitted it, and the plaintiff excepted.

The defendants offered other proceedings of the War Department and of Vermont, to show that troops had been called for, and the quota of Vermont and of Guildhall ascertained; that a draft had been ordered on the 3d of September, 1862, and that on the 22d of August, that year, the plaintiff was duly enrolled in that town as liable to the draft. The plaintiff testified that he left home on the 12th of August, 1862, and the next day went to Canada, where he remained till the next winter. But it did not appear that the authorities of Guildhall had any knowledge as to where the plaintiff was, and one of the selectmen of Guildhall testified that, on the last day of August, 1862, he received notice from four individuals, all residents of Guildhall, that the plaintiff was concealed in Northumberland, and that the plaintiff's father, who resided in Guildhall, had gone to carry a package of clothes to him there. This witness had just seen the plaintiff's father go in that direction with a package of something in his wagon. This witness and others followed on to Northumberland, where they arrived in the early evening, and remained concealed about Hawley's premises, where the horse and wagon of the plaintiff's father was; that in the course of the evening this witness saw the plaintiff's father come out of Hawley's house with another man, whom the witness believed to be the plaintiff; that they went together into a small building near by; that after being in there a while they came out and went back again into the house together; that the plaintiff's father then carried the valise from his wagon into the house, and afterwards left for home; that, this being Sunday night, the witness went to Lancaster and procured the defendants to go with him, early on Monday morning, to Hawley's house, to arrest the plaintiff. The defendants did not find the plaintiff at Hawley's house, but they found the valise, and being informed it belonged to the plaintiff, they took it and examined it, and finding the contents to be wearing apparel, they concluded to keep it a while, one saying they thought the plaintiff would not be likely to leave for Canada without his clothing, and another that he thought by detaining the clothes, it would lead to the arrest of the plaintiff.

The plaintiff's evidence tended to show that he was not, in fact, at Hawley's, and that his father carried the valise and clothes there, in or-

der that Hawley might carry them to his son in Canada, and that Hawley went to Canada the next day; that Hawley's wife gave Colby notice when he came that the plaintiff was not there, to her knowledge; that the plaintiff called on Colby for his valise and clothing a short time before this suit was brought, and that Colby declined to give them up at that time, but said he would leave them with one Gove, where they might be had, if they concluded to give them up.

The court instructed the jury that if they found that the defendants, believing that the plaintiff was at Northumberland, and was about leaving for Canada to avoid the draft, or, believing the plaintiff was secreting himself there for the purpose of absenting himself from Guildhall and so avoiding the draft, they were justified in searching for him; and if, when they found his clothing there, they believed that by taking and detaining it, they would prevent his leaving for Canada, and would be able to secure his arrest, and they thus acted in perfect good faith, and solely for the purpose of securing the arrest of the plaintiff, they would be justified in taking and detaining the property a reasonable time for that purpose; that if the jury should so find, they might find for the defendants, otherwise, for the plaintiff.

The plaintiff requested the court to instruct the jury, that, "if the taking of the property had no tendency to lead to the arrest, and a person acting reasonably would not have done so with that view, then the defendants were liable," which instructions the court declined to give, except so far it might be embraced in the instructions already given.

The jury returned a verdict for the defendants, which the plaintiff moved to set aside.

*Fletcher & Hayward*, for plaintiff.

1.   There was no law of Congress authorizing the order of the War Department, No. 104, and any person, acting under it, acted without right.

2.   That order is in violation of article 4, of the amendment of the constitution of the United States.

3.   The valise and wearing apparel were taken by defendants, and the seizure is attempted to be justified upon the ground that they had a right to arrest the plaintiff, and that this reprisal upon his goods would have a tendency to make him surrender himself.   The court instructed the jury that, "if, when they found his clothing there, they believed that by taking and detaining it they would prevent his leaving for Canada, and would be able to secure his arrest; and that they thus acted in perfect good faith, and solely for the purpose of securing the arrest of the plaintiff, they would be justified in taking said property and detaining it a reasonable time for that purpose."

. We think it will not be contended, that, in general, there is any law that an officer, in order to make an arrest, may seize the property of the person he is seeking to arrest.   And if there is such a law applicable to any case, it seems to us that the law should be certain and unequivocal, and that it does not depend upon what the officer making the seizure *be-*

*lieved* would be the effect of it; but, on the contrary, if the right existed to be exercised at *discretion*, it should have been exercised reasonably; and of this the jury should be the judges, and not the officer. See *Hilliard* v. *Gould*, 34 N. H. 241, and authorities there cited; 3 Allen 311.

When it is the duty of an officer to make an arrest, he must do it in a proper manner, and if he cannot do it in that way, he should not do it at all. *Hooper* v. *Lane*, 52 Com. Law 1095; *Ilsley* v. *Nichols*, 12 Pick. 270.

If defendants were fully authorized to arrest plaintiff, which we deny, they should use lawful means only. To seize and take a man's clothing, if he is not in it, is no part of an officer's duty, in a case like this, and it cannot be justified on the ground that he *believed* that that might bring the owner within reach, so that he might be arrested, no matter how good his intention might have been, for it is a maxim of the law "that no lawful thing founded upon a wrong act can be supported." *Luther* v. *Bruin*, 11 Mod. 50; *Ilsley* v. *Nichols*, above cited.

*Ray*, for the defendants.

PERLEY, C. J. No question is made on the hearing, and none appears to have been made at the trial, that the plaintiff was a resident of Guildhall, Vermont, liable to the draft which had been ordered by the President, and that he had absented himself from the town of Guildhall and the State of Vermont, to avoid the impending draft. He was, therefore, within the terms of the general order No. 104, which authorized such persons to be arrested wherever they might be found within the jurisdiction of the United States. The position is taken for the plaintiff that this order did not warrant his arrest, because the President had no legal authority to issue it.

The Constitution of the United States, article 1, section 8, confers on Congress the power "to raise and support armies, to make rules for the government of the land and naval forces, to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions." Under this grant of power to raise and support armies and call out the militia, there can be no doubt that Congress has power to make and authorize such orders and regulations as may be necessary to prevent those, who are liable by law to military service, from evading that duty; and an order to prevent them from leaving the country and State, to avoid an impending draft, would be necessary for that purpose. This was, therefore, a legal order, if made by the authority of Congress.

By the act of July 17, 1862, it was provided "that whenever the President of the United States shall call for the militia of the States to be employed in the service of the United States, he may specify in his call the period for which such services shall be required, not exceeding nine months." "If, by reason of defects in existing laws, or in the execution of them in the several States, or any of them, it shall be found necessary for enrolling the militia and otherwise putting this act in exe-

cution, the President is authorized to make all necessary rules and regulations."

The President had ordered a draft from the militia, to serve for nine months, under this and former acts. So far as we are informed, there was no law or regulation of this State, or of Vermont, to prevent men from leaving the places where they resided and were enrolled in the militia, and so avoiding the draft; and some regulation like this order was obviously necessary to provide for putting the act of July 17, 1862, in execution. Whether the President, as commander-in-chief, charged with the execution of the law, would not have had power to make the order without this grant of authority from Congress, it is not necessary here to inquire; inasmuch as the power is plainly given by the act. We have had no hesitation in coming to the conclusion that the order was legal and valid, and that if the defendants had found the plaintiff in the county of Coos, they might have legally arrested him under it.

Were the defendants justified in taking possession of the plaintiff's valise and wearing apparel and detaining it, if they believed that he was at Northumberland, about to leave for Canada, or concealing himself there to avoid the draft, and believed that by so doing he would be prevented from escaping to Canada, and that this might lead to his arrest, and they acted in good faith for the sole purpose of effecting his arrest?

Officers, who are empowered to arrest the person, should not be encouraged to intermeddle unnecessarily with the property of the party to be arrested. If a loose rule were admitted on this point, it might lead to great abuse. On the other hand, it was, in this case, of vital importance to the country that orders and regulations intended to secure the recruiting of the army should be effectually enforced; and it would have been unjust to the true men, who willingly remained to take their chance under the draft, if others of a contrary disposition had been allowed to shirk the military service, which they owed to the country. The selectmen of Guildhall were, therefore, performing a duty, which they owed, not only to the public, but to their loyal townsmen, in endeavoring to bring back the plaintiff to abide the draft; and the conduct of the defendants in their attempts to arrest the plaintiff is entitled to an indulgent construction. They would be justified in using, and having undertaken this office for the selectmen of Guildhall, they would be bound to use, all reasonable means to arrest the plaintiff; and for this purpose there can be no doubt that in circumstances which might be supposed they would have a right to take his property. If, for instance, he were meditating flight, and had a horse ready saddled to ride away on, or had a boat prepared to convey him across the river in his flight, there could be no question of the officers' right to take the horse or the boat to prevent his escape, and accomplish his arrest. Those would doubtless be stronger cases than the present; but each case must be decided on its own circumstances, and whether the officer acted reasonably, discreetly, and in good faith, must, in cases of doubt, be inferred from the circumstances as matter of fact. The evidence went to show that the plaintiff's father had carried and deposited the valise and wearing apparel of the plaintiff at Hawley's; the selectmen had been informed that the

plaintiff was concealed in Northumberland ; and the evidence reported, notwithstanding the plaintiff's denial, tends strongly to the conclusion that such was the fact.   At any rate, the defendants had every reason to suppose that the plaintiff was lurking in that neighborhood with the intention of escaping to a safer distance when he had convenient opportunity ; and that he had been waiting there for the wearing apparel, which his father brought and left at Hawley's.   It seems to us that the defendants might reasonably suppose, in these circumstances, that taking and detaining the valise and contents would prevent or delay his departure, and lead to his arrest, and that the instructions of the court on this point were correct.

The case does not find, and there is no evidence reported, from which it can be inferred, that the defendants broke into Hawley's house, or committed any other wrong in order to obtain possession of the plaintiff's valise and clothing.   The authorities have, therefore, no application in which it has been held that property cannot be taken on a legal warrant, if possession of the property was first obtained by a wrongful act.

The provision of the constitution against unreasonable searches and seizures cannot be understood to prohibit a search or seizure, made in attempting to execute a military order authorized by the constitution and a law of Congress, when the jury under correct instructions from the court, have found that the seizure was proper and reasonable, as they have in this case.

The objection that the order No. 104 was not legally proved, is not insisted on, and cannot prevail.

*Judgment on the verdict.*