## WEIGHTMAN v. UNITED STATES.
### No. 3913.

Circuit Court of Appeals, First Circuit.
April 3, 1944.

Alfred A. Albert, of Boston, Mass., and John Henry Denton, of Bluemont, Va., for appellant.

Alexander Murchie, U. S. Atty., of Concord, N. H., for appellee.

Before MAHONEY and WOODBURY, Circuit Judges, and PETERS, District Judge.

WOODBURY, Circuit Judge.

This is an appeal from a judgment sentencing the defendant to a term of imprisonment after he had been found guilty by a jury of knowingly failing to perform a duty imposed upon him by the Selective Training and Service Act of 1940, 54 Stat. 885, 50 U.S.C.A.Appendix, § 301 et seq.

There is no substantial dispute about the facts. The defendant duly registered in accordance with the above Act and, apparently without difficulty, satisfied his local draft board that he was a conscientious objector opposed to both combatant and noncombatant military service. He was accordingly classified in IV-E, that being the classification appropriate for him under Regulation 622.51(a). He passed his physical examination and on June 10, 1942, in response to an order of his local board, he reported for assignment to work of national importance under civilian direction to Civilian Public Service Camp No. 32 situated in the town of Thornton, New Hampshire. Upon arrival he was assigned by the director of the camp to work in the White Mountain National Forest. His work consisted in the selective cutting of trees to improve the stand of timber, the construction of a fire tower on Osceola Mountain, the improvement of fire roads, and other work of like nature, all under the supervision of the United States Forest Service and all in the National Forest named above. On December 16, 1942, the defendant refused to perform any further work of the above nature on the ground that it was not work of national importance. Persisting in his refusal to work, he was indicted, tried by

jury, and convicted under § 11 of the Selective Training and Service Act of 1940. 50 U.S.C.A.Appendix, § 311.

He takes this appeal to us on two grounds; first that § 5(g) of the Selective Training and Service Act of 1940, 54 Stat. 889, 50 U.S.C.A.Appendix, § 305(g) which, so far as material here, is quoted in the margin,[1] and the regulations promulgated thereunder, are unconstitutional and void, and, second, that he was denied due process of law by the refusal of the court below to charge the jury that it could consider as a defense the question of whether or not the work to which he was assigned was in fact work of national importance.

It is to be noted at the outset that the defendant does not question the constitutional power of Congress to raise an army by conscription nor does he contend that conscientious objectors have a constitutional right to be excused from military service. He admits that the exemption of the class to which he belongs is by congressional favor. He says in his brief: "The issue raised here relates only to the conscription of the conscientious objector, who is segregated, interned, deprived of his opportunity to earn a livelihood, and deprived of the earnings of his labor. The creation of civilian public service camps has put into existence the slave labor camp, the conscription camp. The validity of this system is all that is here called in question."

■ The defendant's first contention is that § 5(g) of the Selective Training and Service Act of 1940 provides for an unconstitutional delegation of legislative power. He says that it does not establish any standard whereby the President or his duly authorized appointee, the Director of Selective Service, can determine what is or is not "work of national importance", and that it does not authorize what he calls the "internment" of conscientious objectors in "concentration camps". Consequently he argues that the President and the Director of Selective Service in defining "work of national importance" and in setting up a system of civilian public service camps and ordering conscientious objectors confined therein has "usurped the legislative power from Congress contrary to Article I, Section 1 of the Constitution". We do not agree.

■ It is, of course, clear that Congress cannot delegate the legislative power conferred upon it by the Constitution to the extent of authorizing others to formulate policies, but it does not follow from this that Congress must spell out each legislative policy which it may itself declare in complete detail. It must itself establish general policies but once having done this it may then validly delegate to administrative officials the power to issue regulations legislative in character within the framework of the legislative standards laid down. Avant v. Bowles, Em.App., 139 F.2d 702, 706; see also McKinley v. United States, 249 U.S. 397, 39 S.Ct. 324, 63 L.Ed. 668. The Supreme Court in Currin v. Wallace, 306 U.S. 1, 15, 59 S.Ct. 379, 387, 83 L.Ed. 441, recently said: "We have always recognized that legislation must often be adapted to conditions involving details with which it is impracticable for the legislature to deal directly. We have said that—'The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicability, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply. Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility.' Panama Refining Co. v. Ryan, supra, [293 U.S. 388, 421], 55 S.Ct. [241, 79 L.Ed. 446]. In such cases 'a general provision may be made, and power given to those who are to act under such general provisions, to fill up the details'. Wayman v. Southard, 10 Wheat. 1, 43, 6 L.Ed. 253."

---

[1] "Nothing contained in this Act shall be construed to require any person to be subject to combatant training and service in the land or naval forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Any such person claiming such exemption from combatant training and service because of such conscientious objections whose claim is sustained by the local board shall, if he is inducted into the land or naval forces under this Act, be assigned to noncombatant service as defined by the President, or shall, if he is found to be conscientiously opposed to participation in such noncombatant service, in lieu of such induction, be assigned to work of national importance under civilian direction."

See also Buttfield v. Stranahan, 192 U.S. 470, 496, 24 S.Ct. 349, 48 L.Ed. 525; United States v. Grimaud, 220 U.S. 506, 517, 31 S.Ct. 480, 55 L.Ed. 563; United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 85, 53 S.Ct. 42, 77 L.Ed. 175; A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 541, 542, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947. Under the rule we have no doubt that Congress has the power under the Constitution to delegate the duty of determining what is and what is not "work of national importance". As a practical matter it could do nothing else. It would certainly be "impracticable" for Congress itself to attempt to differentiate between all work which is, and all work which is not, of that nature.

Neither do we doubt the constitutional power of Congress to delegate to others the duty of setting up some system whereby persons conscientiously opposed to even noncombatant military service are put to work of national importance in lieu of induction into the military establishment. Congress clearly stated its policy with respect to conscientious objectors in general by providing that those who are conscientiously opposed only to combatant military service shall be inducted into the land or naval forces but assigned therein to noncombatant service as defined by the President, and that those who are conscientiously opposed, as the defendant is, to any form of military service shall not be inducted into the armed forces but instead assigned to work of national importance under civilian direction. To be sure Congress did not say how its policy with respect to those in the latter category was to be effectuated, but, having made a "general provision" with respect to them, we think it could constitutionally leave that matter as one of detail to be filled up by administrative action.

▮ Furthermore we think that the President, aside from his ordinary peace-time powers, has power to take action with respect to conscientious objectors for the reason that the Constitution (Article II, § 2, Cl. 1) invests him as Commander in Chief of the Army and Navy of the United States "with the power to wage war which Congress has declared, and to carry into effect all laws passed by Congress for the conduct of war and for the government and regulation of the Armed Forces." Ex parte Quirin, 317 U.S. 1, 26, 63 S.Ct. 2, 10, 87 L. Ed. 3.

The question of the constitutionality of the action taken remains to be considered. The answer to it is not indicated by references, however eloquent, to "concentration camps" and "slave labor". It lies in the scope of the so called "War Powers" given to the national government by the Constitution of the United States.

▮ "The war power of the national government", the Supreme Court recently said quoting Charles Evans Hughes, War Power Under the Constitution, 42 A.B.A. Rep. 232, 238, "is 'the power to wage war successfully'. It extends to every matter and activity so related to war as substantially to affect its conduct and progress." Kiyoshi Hirabayashi v. United States, 320 U.S. 81, 93, 63 S.Ct. 1375, 87 L.Ed. 1774. It authorizes conscription into the military service (Selective Draft Law Cases (Arver v. United States), 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Ann. Cas.1918B, 856), even conscription into combatant military service of those who are conscientiously opposed to participation in war (United States v. MacIntosh, 283 U.S. 605, 622-623) and "Under this grant of power to raise and support armies and call out the militia, there can be no doubt that Congress has power to make and authorize such orders and regulations as may be necessary to prevent those, who are liable by law to military service, from evading that duty." Allen v. Colby, 47 N.H. 544, 547. In view of the breadth of the war power as indicated by the above cases and the cases cited therein, we have no doubt that the system devised for the treatment of persons who by reason of religious training and belief are conscientiously opposed to participation in war in any form does not deprive them of any of their constitutional rights even though, in practical effect, it deprives them of their full liberty and requires them to work at a rate of compensation far below what could be earned in civilian life and even below what could be earned in the armed forces.

▮ By granting the favor of exemption from military service to conscientious objectors without requiring membership in a presently organized and well recognized religious sect or organization whose existing creed forbids its members to participate in war in any form, as the Selective Draft Law of 1917 did, 40 Stat. 78, 50 U. S.C.A.Appendix, § 201 et seq., Congress raised a serious practical problem for those entrusted with the administration of the Act

192

because it required investigation of personal, not group beliefs—a matter which can easily be falsified without detection. If conscientious objectors should simply be excused from the burden of military duty cast upon other men of like age, employment and family responsibilities, thereby leaving them free to enjoy civilian life, no doubt some, maybe many, men would falsely profess conscientious objections only to obtain the privileged status of exemption. To weed out the insincere and thus avoid an obvious abuse, the way of the honest conscientious objector has been made hard. But it has not been made as hard as the defendant would seem to have us imply from his talk of concentration camps and slavery. It appears that the camp to which the defendant was assigned was administered by the American Friends Service Committee according to agreements worked out with the National Service Board for Religious Objectors as its agent and the Director of the Selective Service System; that during working hours the men assigned to the camp were under the direction of the United States Forest Service and that during off hours they were under the control of the camp director, himself a Quaker as is the defendant, and that no greater severity or confinement was imposed than was necessary under the circumstances. In short, it appears that the camp was run in a humane and civilized manner and with consideration for its inmates. Possibly the system established "may be condemned by some as unwise or illiberal or unfair" (Cardozo, J., concurring in Hamilton v. Regents, 293 U.S. 245, 266, 55 S.Ct. 197, 205, 79 L.Ed. 343) but this is no basis for holding the system unconstitutional. Since the situation presented by the Act called for "the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of war-making, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs". Kiyoshi Hirabayashi v. United States, 320 U.S. 81, 93, 63 S.Ct. 1375, 87 L.Ed. 1774. Under the circumstances we do not believe that the action taken with respect to conscientious objectors has exceeded constitutional bounds. In accord see Hopper v. United States, 9 Cir., 142 F.2d 181; United States v. Van Den Berg, 7 Cir., 139 F.2d 654, and cases cited.

▆ The second ground for this appeal—the ground that the defendant was denied due process of law because the court below refused to instruct the jury that it could acquit if it should find that the work the defendant was set to do was not work of national importance—requires only brief consideration. We need not decide whether the issue sought to be raised may ever be germane in cases of this sort because here there is no factual basis for the issue to rest upon. The only evidence in the case is that the defendant was put to the work of maintaining and improving national property—a national forest—and certainly in reason no one can say that this is not work of national importance.

The judgment of the District Court is affirmed.