**UNITED STATES v. BROOKS.**

District Court, S. D. New York.
April 20, 1944.

996

James B. M. McNally, of New York City, (K. Bertram Friedman, Stuart Z. Krinsly, and Arthur C. Power, all of New York City, of counsel), for the United States.

Ernest Angell, of New York City, for defendant.

RIFKIND, District Judge.

The defendant was indicted for a violation of the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix § 311, in that he unlawfully and knowingly failed to perform a duty required of him under that law and the regulations made pursuant thereto, namely, to report for transportation to a Civilian Public Service Camp for work of national importance. To that indictment defendant has interposed a demurrer and a plea in abatement.

The demurrer is founded upon four claims. 1. The provisions of the Act, the Regulations, and the orders which are alleged to have been violated by the defendant are in conflict with the Fifth Amendment, the First Amendment and the Thirteenth Amendment of the Constitution. 2. The act is void because it exceeds the powers conferred upon Congress by the Constitution. 3. The act contains an invalid delegation of legislative powers. 4. The regulations and orders exceed the authority conferred by the Act.

The plea in abatement, to which the government has demurred, alleges that the defendant, a citizen, has been classified as a conscientious objector opposed to both combatant and noncombatant service in the armed forces; that defendant is conscientiously opposed, by reason of religious training and belief, not only to combatant and noncombatant service but also to any form of compulsory labor in civilian camps; that the camp, to which defendant has been ordered, is in an isolated location in Colorado; that the work pursued at the camp is not in aid of the defense of the United States or of its military establishment; that the rate ·of compensation, $3 to $7.50 a month, is wholly inadequate for defendant and his dependent wife; that assignees to the camp do not receive dependency allowances nor the benefits of insurance of persons in the armed forces nor the reemployment rights of veterans nor are·they eligible to compensation under the Employees' Compensation Act, 5 U.S.C.A. § 751 et seq.; that they may not leave the camp without permission and are subject to punishment in the discretion of the Camp Director; and that defendant has not been convicted of any crime.

Respect for the integrity of conscience is unquestionably firmly embedded in our constitutional foundations. Reason finds it difficult to comprehend the appeal for the shelter of the Constitution by one who is unwilling to defend the Constitution. Logic looks askance at one who, asserting his right to freedom of religion, refuses to have any share in resisting an enemy who has declared war upon us and whose first act in every land he has invaded has been to abolish freedom of religion. However, it is not given to judges to dwell upon the human 'frailty of inconsistency.

In keeping with historical precedent, Congress has extended to conscientious objectors exemption from combatant service, and for the first time, has gone beyond that and given immunity to those whose scruples forbid participation in noncombatant military service. It has not, however, exempted those who are 'conscientiously opposed to "compulsory labor in civilian camps" from compliance with the requirement of the statute that they "be assigned to work of national importance under civilian direction".

In so doing Congress has not violated the First Amendment. Even the minority opinion in United States v. Macintosh, 1931, 283 U.S. 605, 633, 51 S.Ct. 570, 578, 75 L.Ed. 1302, said: "I agree with the statement in the opinion of the Circuit Court of Appeals in the present case that: 'This, federal legislation is indicative of the actual operation of the principles of the Constitution, that a person with conscientious or religious scruples need not bear arms, although, as a member of society, he may be obliged to render services of a noncombatant nature.' "

In West Virginia Board of Education v. Barnette, 1943, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674, three of the justices rested their concurring opinions upon the freedom of religion clause of the Constitution. Justices Black and Douglas nevertheless reasserted the principle that that clause was not absolute. They said: "No well-ordered society can leave to the individuals an absolute right to make final decisions, unassailable by the State, as to everything they will or will not do. The

First Amendment does not go so far. Religious faiths, honestly held, do not free individuals from responsibility to conduct themselves obediently to laws which are * * * imperatively necessary to protect society as a whole from grave and pressingly imminent dangers * * *." 319 U.S. at page 643, 63 S.Ct. at page 1188, 87 L.Ed. 1628, 147 A.L.R. 674.

Taking into consideration the menacing posture of world events when Congress enacted this statute, I am not prepared to say that Congress was unwarranted in making the assumption, which is implicit in the legislation, that more generous treatment of conscientious objectors might so interfere with the raising of armies for the defense of the nation as to expose it to pressingly imminent dangers.

I conclude that the Act and the Regulations do not violate the First Amendment.

■ Nor do they violate the Thirteenth. The asserted incompatibility of the Act and Regulations with the Thirteenth Amendment is predicated on the treatment by the defendant of the provision for work of national importance as completely severed and independent from the comprehensive mobilization contemplated by the Selective Training and Service Act. To attack these regulations as if they constituted a discrete measure for the exaction of labor from persons holding specified beliefs is to attack a straw man. The regulations, as well as the statutory provision for work of national importance, must be construed, as indeed they are, as part of a comprehensive scheme for the utilization of the able-bodied manpower of the nation for its defense. The argument advanced by the defendant leads to this anomaly: That Congress may, without doing violence to the Constitution, compel the induction of conscientious objectors into the armed forces but that if Congress chooses to honor their scruples of conscience it must forego their services altogether. I do not believe that the Thirteenth Amendment can be validly charged with introducing so inflexible a rule.

The first constitution of New York, adopted in 1777, provided: "That all such of the inhabitants of this State being of the people called Quakers as, from scruples of conscience may be averse to the bearing of arms, be therefrom excused by the legislature; and do pay to the State such sums of money, in lieu of their personal service, as the same may, in the judgment of the legislature, be worth." Art. 40. United States v. Macintosh, 1931, 283 U.S. 605, 632, 51 S.Ct. 570, 75 L.Ed. 1302. Would it be sensible to test the validity of such a provision, in the light of present constitutional requirements, by treating it as a tax imposed upon Quakers qua Quakers? Could it be argued, after the adoption of the Fourteenth Amendment, that the collection of such sums of money from a conscientious objector constituted a taking of property without due process of law or a denial of the equal protection of the laws?

Assignment of a conscientious objector to service does not constitute the imposition of an invalid condition upon a privilege. Western Union T. Co. v. Kansas. 1909, 216 U.S. 1, 30 S.Ct. 190, 54 L.Ed. 355. The exaction of service from conscientious objectors under civilian direction is not a condition upon exemption from induction into the armed forces. The assignment to work of national importance is not predicated upon the voluntary assent of the conscientious objector any more than the induction of other citizens in the armed forces is premised upon their consent. Both legislative mandates flow from the same constitutional power. The fact that the former work under civilian direction is quite irrelevant. I find nothing in the Constitution which requires that training for defense shall be conducted by military rather than by civilian officers. Nor does it matter that the actual labor performed by the assignees is not directly in aid of the defense of the United States or of its military establishment. It is sufficient that in the judgment of Congress such labor is of national importance; that its performance by assignees releases others for services more directly concerned with military action; and that assignment of conscientious objectors tends to deter others from asserting a claim to exemption.

I conclude that neither the Act nor the Regulations trespass upon the Thirteenth Amendment.

■ The argument that the conditions of service in the civilian camps as imposed by the regulations are so discriminatory in comparison with conditions at military camps as to amount to a denial of due process is quite without merit. True, the assignee's pay is less, he cannot buy insurance on the same terms, he receives no dependency allowance nor compensation for injury. These privileges and benefits are

clearly matters of legislative discretion. It cannot be said as a matter of law that service in the armed forces, together with its attendant perils, is so comparable to the peaceful pursuits of a civilian camp that the withholding from the latter of benefits accorded to the former amounts to a denial of due process.

■ That the statute itself contains no unconstitutional delegation of legislative power, Const. art. 1, § 1, is apparent from a reading of § 310(a) which simply provides, "The President is authorized—(1) to prescribe the necessary rules and regulations to carry out the provisions of this Act; * * *."

But the defendant urges that the regulations exceed the powers delegated by Congress in the following respects:

(a) quasi-penal detention in isolated internment camps, called euphemistically "civilian public service camps",

(b) labor without pay ($3 per month "cash allowances"),

(c) no element of choice of type of service or location,

(d) labor-internment for six months beyond the duration of the war,

(e) power of officials arbitrarily to assess fines, to deny furloughs, to add 40 days of service annually to the total term—all without hearing or appeal,

(f) no provision for dependent's allowances, death or disability benefits.

■ Of these, items (d) and (e) are not now in issue. It will be time enough when and if these powers are exercised to pass upon their validity. Item (f) is a matter of congressional action and since Congress has not authorized dependency allowances or disability benefits for camp assignees the regulations cannot be said to exceed the authority when they make no provision therefor. Attempts to obtain such legislation have been made and failed. See, S. 315 and S. 675, First session, 78th Congress. Item (c) does not exceed the power conferred by statute since the statute nowhere suggests that the assignee shall have a choice of work or location. Items (a) and (b) deal with the type of camp organization and the rate of pay. True, the statute says nothing about camps nor does it prescribe the rate of compensation; but that Congress has knowledge of the system of camps and has, within appropriate limits, lodged discretion concerning the rate of compensation is clear from the appropriation acts and the hearings held in connection therewith. Thus, the Act of June 27, 1942, Public Law 630, 56 Stat. 416, appropriating funds for the Selective Service System for the fiscal year 1943, provides as follows: "* * * That such amounts as may be necessary shall be available for the planning, directing, and operation of a program of work of national importance under civilian direction, either independently or in cooperation with governmental or nongovernmental agencies, and the assignment and delivery thereto of individuals found to be conscientiously opposed to participation in work of the land or naval forces, which cooperation with other agencies may include the furnishing of funds to and acceptance of money, services, or other forms of assistance from such nongovernmental agencies for the mere effectual accomplishment of the work; and including also the pay and allowances of such individuals at rates not in excess of those paid to persons inducted into the Army, under the Selective Service System, and such privileges as are accorded such inductees: * * *."

I conclude that the plaintiff's demurrer to the plea in abatement must be sustained and that defendant's demurrer to the indictment must be overruled.

United States v. Gormly, 7 Cir., 1943, 136 F.2d 227, certiorari denied 320 U.S. 753, 64 S.Ct. 60.

United States v. Mroz, 7 Cir., 1943, 136 F.2d 221; Weightman v. United States, 1 Cir., 142 F.2d 188.